Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Garin Scollan (GS 7780)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company,
GEICO Indemnity Company, GEICO General Insurance Company
and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE  COMPANY and GEICO CASUALTY
COMPANY,

Docket No.:

Plaintiffs,

-against-

GLENN WHITNEY, D.C.,
SPINEISLAND FOR CHIROPRACTIC, P.C.,
and  JOHN DOE DEFENDANTS "1" – "5",

**Plaintiffs Demand a
Trial by Jury**

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, Glenn Whitney, D.C., SpineIsland

For  Chiropractic,  P.C.,  and  John  Doe  Defendants  "1"  through  "5"  (collectively,  the

"Defendants"), hereby allege, upon information and belief, as follows:

## NATURE OF THE ACTION

1.       This is an action for breach of contract, declaratory judgment, and fraud in which

GEICO seeks (i) monetary damages against Defendants and (ii) a determination that GEICO is

not legally obligated to pay Defendants for "No-Fault" insurance charges submitted under the name of SpineIsland For Chiropractic, P.C. ("SpineIsland Chiro").

2.      SpineIsland Chiro's record owner, Glenn Whitney, D.C. ("Whitney"), has breached the terms of a settlement agreement that was executed between GEICO and Whitney in 2015 and improperly caused No-Fault insurance charges to be submitted to GEICO under the name of SpineIsland Chiro for purported healthcare services to individuals involved in automobile accidents and eligible for coverage under policies of automobile insurance issued by GEICO ("Insureds").

3.      Whitney, as part of a settlement with GEICO in another case involving an older professional corporation listed under Whitney's name, MSK Wellness, D.C., P.C., agreed on behalf of himself and any other entity he owned or controlled to restrictions on future billing. Despite execution of the settlement agreement in 2015, Whitney has repeatedly breached the agreement by submitting billing under the name of SpineIsland Chiro in violation of the terms of the agreement and thereafter pursuing collection on the improper charges.

4.      Whitney also has submitted charges to GEICO under the name of SpineIsland Chiro that are fraudulent in that they have been submitted pursuant to a fraudulent scheme involving pre-determined treatment protocols, designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.  SpineIsland Chiro itself maintains no stand-alone practice, has no patients of its own, and provides no legitimate or medically necessary services.  SpineIsland Chiro is simply one of many conduits that Whitney and others working with him – including John Doe Defendants "1" through "5" – have used to financially enrich themselves by exploiting Insureds' No-Fault insurance benefits.

5.      Through the fraudulent scheme described herein, along with the breach of contract, the Defendants have caused GEICO to suffer damages of more than $117.000.00. In addition to recovering these damages, GEICO also seeks a declaration that GEICO is not legally obligated to pay reimbursement of more than $274,000.00 in pending claims submitted by or through SpineIsland Chiro.

## THE PARTIES

### I.      Plaintiffs

6.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

7.      Defendant Whitney resides in and is a citizen of New York.  Whitney was licensed to practice chiropractic in New York on February 9, 1998 and is listed as the owner of Defendant SpineIsland Chiro.

8.      Defendant SpineIsland Chiro is a New York chiropractic professional corporation incorporated on February 3, 2012, with its principal place of business at 1300A Woodfield Road, Rockville Centre, New York.

9.      John Doe Defendants "1" though "5" are additional individuals and entities whose names are not yet known to GEICO.  John Doe Defendants "1" through "5" at all times have participated in the fraudulent and unlawful scheme alleged in this Complaint.

3

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

11.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

**I.     An Overview of the No-Fault Laws and Licensing Statutes**

12.     GEICO underwrites automobile insurance in New York.

13.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

14.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

15.     An Insured can assign his/her right to No-Fault Benefits to healthcare goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of

Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

16.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

17.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … .

18.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

19.     New York law prohibits, *inter alia*, licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals; aiding and abetting an unlicensed person to practice a profession; offering any fee or consideration to a third party for the referral of a patient;

and permitting persons not authorized to practice a profession to share in the fees for professional services.

20.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

21.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

22.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

23.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

24.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Breach of the Settlement Agreement By Whitney

25.     In September 2014, GEICO commenced a lawsuit in the United States District Court for the Eastern District of New York entitled <u>Government Employees Insurance Company, et al. v. Roger Jacques, et al.</u>, Docket No.: 11 CV 05299 (the "Original Action") alleging the commission of a wide ranging fraud scheme against GEICO involving the submission of thousands of fraudulent no-fault insurance charges by more than twenty-five (25) healthcare providers operating from a series of multidisciplinary medical clinics in Brooklyn, Queens, and Nassau Counties.  Among the more than twenty-five defendants named in the Original Action were Whitney and a professional corporation that he owned by the name of MSK Wellness, D.C., P.C. ("MSK").

26.     Whitney and his professional corporation, MSK, appeared in the Original Action through counsel, Schwartz Law, P.C.

27.     Whitney, MSK, and GEICO entered into a settlement agreement (the "Settlement Agreement") in the Original Action that was fully executed in April 2015.

28.     As is relevant for the present action, Whitney agreed in the Settlement Agreement to be bound by certain conditions and restrictions in connection with the submission of future billing to GEICO for healthcare services whether provided by MSK, Whitney, *or any other entity owned or controlled, in whole or in part, directly or indirectly by MSK or Whitney.*

29.     Whitney's agreement to be bound by certain conditions and restrictions in connection with the submission of future billing applies to SpineIsland Chiro, as it is an entity purportedly owned and controlled by Whitney.

30.     In particular, Whitney agreed in the Settlement Agreement, in pertinent part, as follows:

### 3. Pending and Future Lawsuits/Arbitrations and Claims

*       *       *

D.     [A]ny billing submitted to GEICO by or on behalf of MSK, Whitney, or any other entity owned or controlled, in whole or in part, directly or indirectly by MSK or Whitney, shall be subject to the following restrictions:

*       *       *

(iv)     Notwithstanding anything to the contrary herein, MSK, Whitney, or any other entity owned or controlled, in whole or in part, directly or indirectly by MSK or Whitney may bill GEICO for a maximum of two charges per Insured under current procedural terminology code 97750 for ROM/MT Tests; however, MSK, Whitney, or any other entity owned or controlled, in whole or in part, directly or indirectly by MSK or Whitney shall not bill GEICO for, and GEICO shall not be obligated to pay MSK, Whitney, or any other entity owned or controlled, in whole or in part, directly or indirectly by MSK or Whitney for, more than two charges per Insured under current procedural terminology code 97750 for ROM/MT Tests.

(v)     To the extent that MSK, Whitney, or any other entity owned or controlled, in whole or in part, directly or indirectly by MSK or Whitney intends to submit any future billing to GEICO for any health care services or goods other than Chiropractic Manipulation, initial chiropractic evaluations, follow up chiropractic evaluations or ROM/MT Tests, they shall provide GEICO with 30 days' written notice as set forth in Section 4 herein prior to submitting such billing.

E.     Other than as provided for in this Agreement, MSK and Whitney agree that they shall not, in the future, submit or cause to be submitted bills to, or commence or cause to be commenced any lawsuits, arbitrations, or other proceedings against, GEICO for goods and/or healthcare services provided by or through MSK, Whitney, or any other entity owned or controlled, in whole or in part, directly or indirectly by MSK or Whitney. MSK and Whitney further agree that if they submit or cause to be submitted bills to GEICO, or commence or cause to be commenced lawsuits, arbitrations or other proceedings against GEICO, other than as provided for in this Agreement, and do not withdraw such bills, lawsuits, arbitrations or other proceedings within ten (10) days following written notice in accordance with Section 4, then MSK and Whitney will become immediately liable to and pay GEICO: (i) an amount equal to the amount of the bill submitted or the amount sought in such lawsuit, arbitration or other proceeding; as well as (ii) the legal fees, costs and disbursements incurred by GEICO in securing compliance with this Agreement.

31.     In direct violation of the Settlement Agreement, Whitney breached paragraph 3(D)(iv) of the Settlement Agreement by submitting bills under the name of SpineIsland Chiro for performance of more than two units of range of motion and muscle tests ("ROM/MT") per Insured, and by submitting billing for ROM/MT using CPT codes other than 97750.

32.     In addition, in direct violation of the Settlement Agreement, Whitney breached paragraph 3(D)(v) of the Settlement Agreement by submitting bills to GEICO for NCV and H-Reflex Testing under the name of SpineIsland Chiro without providing the advance 30 days written notice to GEICO required by the Settlement Agreement before Whitney or any entity he owns and controls can bill for such tests.

33.     By letter dated June 27, 2016, GEICO sent written notice of the breaches of the Settlement Agreement to Whitney's counsel, Schwartz Law, PC.

34.     Thereafter, Whitney sent GEICO monetary reimbursement for the violations of paragraph 3(D)(iv) and 3(E) of the Settlement Agreement.

35.     On July 27, 2016, Whitney also sent GEICO written notice of the intent to bill GEICO for NCV and H-Reflex testing, which pursuant to paragraph 3(D)(v) of the Settlement Agreement would permit Whitney to bill for this testing 30 days *after* the notice; to wit, beginning on August 27, 2016.

36.     Notwithstanding the above, Whitney again violated the terms and conditions of the Settlement Agreement.

37.     By letter dated March 27, 2017, GEICO sent a second written notice of breaches of the Settlement Agreement to Whitney's counsel, Schwartz Law, PC.

38.     In particular, Whitney breached the Settlement Agreement by (i) again billing for ROM/MT testing in excess of two units per Insured using SpineIsland Chiro; and (ii) billing for NCV and H-Reflex using SpineIsland Chiro prior to August 27, 2016, which is the first date that

such billing was permitted in accordance with the Settlement Agreement and Whitney's written 30 day notice (collectively, the "Prohibited Billing").

39.     The chart annexed hereto as Exhibit "1" sets forth the Prohibited Billing that has been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

40.     In direct violation of the Settlement Agreement, Whitney and SpineIsland Chiro have improperly obtained payment from GEICO based on the Prohibited Billing.

41.     In connection with Whitney's submission of the Prohibited Billing, Whitney and SpineIsland Chiro also have commenced various collection suits and arbitrations against GEICO seeking payment on that billing in violation of paragraph 3(E) of the Settlement Agreement (the "Prohibited Collection Actions").

42.     As a result of the breach of the Settlement Agreement by Whitney, GEICO has been required to defend the Prohibited Collection Actions and, in connection with GEICO's defense, (i) pay non-refundable fees to the American Arbitration Association ("AAA"); (ii) retain counsel and pay the associated legal fees; and (iii) incur other costs and expenses.

43.     Pursuant to paragraph 3(E) of the Settlement Agreement, Whitney agreed that if he submitted or caused to be submitted bills to GEICO, or commenced or caused to be commenced lawsuits, arbitrations or other proceedings against GEICO not permitted by the agreement, and did not withdraw such bills, lawsuits, arbitrations or other proceedings within ten (10) days following written notice, then Whitney would become immediately liable to and pay GEICO: (i) an amount equal to the amount of the bill submitted or the amount sought in such lawsuit, arbitration or other proceeding; as well as (ii) the legal fees, costs and disbursements incurred by GEICO in securing compliance with the Settlement Agreement.

44.     Pursuant to paragraph 3(G) of the Settlement Agreement, Whitney also agreed that, to the extent GEICO made any payments on any clams or bills in excess of what is required

under the Settlement Agreement (*i.e.*, the Prohibited Billing), then GEICO shall be entitled to return of the money from MSK, Whitney, or any other entity owned or controlled, in whole or part, directly or indirectly by MSK or Whitney within 30 days following written notice in accordance with the agreement.

45.     Whitney and SpineIsland Chiro have failed and refused to return any of the monies paid by GEICO in connection with the Prohibited Billing despite due demand for same.

46.     Whitney and SpineIsland Chiro have failed and refused to both dismiss the Prohibited Collection Actions or pay GEICO the amounts due and owing pursuant to paragraph 3(E) of the Settlement Agreement.

47.     GEICO has suffered and will continue to suffer monetary damage on account of Defendants' violations of the Settlement Agreement.

48.     Pursuant to the Settlement Agreement, GEICO is entitled to recover from Whitney all of the legal fees, costs and disbursements incurred by GEICO in securing compliance with the agreement.

**III.    The Defendants' Fraudulent Scheme Using SpineIsland Chiro**

**A.      Overview of the Fraudulent Scheme**

49.     Whitney has not only used SpineIsland Chiro to submit billing to GEICO in violation of the Settlement Agreement reached in the Original Action, but is also using SpineIsland Chiro in furtherance of another fraudulent scheme to financially enrich himself and the other Defendants by exploiting Insureds' No-Fault insurance benefits.

50.     The Defendants operate SpineIsland Chiro on an iterant basis, having the professional corporation travel to the offices of numerous multidisciplinary No-Fault medical clinics (the "Clinics") which, pursuant to a fraudulent scheme involving pre-determined treatment and billing protocols, provide SpineIsland Chiro with referrals and access to the

Clinics' patient bases so that SpineIsland Chiro can perform and bill insurers for excessive and medically unnecessary services, including ROM/MT and diagnostic nerve testing in the form of electromyography tests and nerve conduction velocity tests (collectively the "Fraudulent Services").

51.     As set forth in detail below, the Defendants have wrongfully obtained from GEICO hundreds of thousands of dollars resulting from the Fraudulent Services because:

(i)      the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(iii)    the Fraudulent Services were provided – to the extent they were provided at all – pursuant to a fraudulent scheme involving illegal referral and kickback relationships among the Defendants and the owners and controllers of the multidisciplinary Clinics where the Defendants purported to provide the Fraudulent Services.

52.     As also discussed below, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (iii) the Fraudulent Services were provided – to the extent they were provided at all – pursuant to the fraudulent schemes involving illegal referral and kickback arrangements implemented and entered into among the Defendants and the owners and controllers of the Clinics where the Defendants purported to provide the Fraudulent Services.

As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the SpineIsland Chiro.

53.     The chart annexed hereto as Exhibit "2" sets forth the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

54.     The Defendants' fraudulent scheme began as early as 2013 and has continued uninterrupted through present day.

**B.      The Fraudulent Operation of SpineIsland Chiro**

55.     Despite purporting to be a legitimately owned and operated professional corporation, SpineIsland Chiro (i) maintains no stand-alone practice; (ii) has no internet website; (iii) does not advertise for patients; (iv) is not the owner or leaseholder of the real property from which it purports to provide the Fraudulent Services; and (v) provides no legitimate or medically necessary services.

56.     Instead, SpineIsland Chiro travels to the offices of numerous Clinics that – as part of a fraudulent scheme involving pre-determined billing and treatment protocols and improper referral arrangements – provide SpineIsland Chiro with access to the Clinics' patients in order to perform the grossly excessive and medically useless Fraudulent Services.

57.     SpineIsland Chiro is owned as of record by Whitney, who has had at least seven professional corporations listed under his name, including Glenn H. Whitney D.C., P.C., Corona Family Chiropractic Care, P.C., Precision Chiropractic, P.C., Triboro Chiropractic, P.C., Glenridge Chiropractic, P.C., and NY Metro Chiropractic, P.C.

58.     Whitney incorporated the multiple professional corporations listed under his name in 2003, 2007, 2011, 2012, 2013, 2016, and 2017 in order to conceal from GEICO and other New York automobile insurers the volume of suspect billing from SpineIsland Chiro and any other individual corporation listed under his name.

59.     Whitney uses SpineIsland Chiro to generate excessive and fraudulent billing by operating SpineIsland Chiro on an iterant basis at, among others, the following Clinics, where Whitney and SpineIsland Chiro received a steady volume of patients through no efforts of their own:

- 100-05 ROOSEVELT AVENUE, Corona, New York
- 183-11 HILLSIDE AVE, Jamaica, New York
- 34-09 MURRAY STREET, Flushing, New York
- 172-17 JAMAICA AVENUE, Jamaica, New York
- 156-09 NORTHERN BLVD, Flushing, New York
- 495 WESTBURY AVE, Carle Place, New York
- 959 BRUSH HOLLOW RD, Westbury, New York
- 2367 WESTCHESTER AVE, Bronx, New York
- 127 EAST 107TH ST, New York, New York
- 12 WEST 32ND STREET. New York, New York
- 391 CENTRAL AVENUE, Valley Stream, New York
- 97-01 101ST AVE, Ozone Park, New York
- 9A DAVISON AVENUE. Oceanside, New York
- 440 AUDUBON AVE, New York, New York

60.     Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of these Clinics, including many of the Clinics listed above, are known to operate under the unlawful ownership and control of unlicensed laypersons and are actually nothing more than medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

61.     In fact, GEICO received billing from many of these Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice;" without any legitimate transfer of patient care from one professional corporation to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

62.     For example, GEICO has received billing for purported healthcare services rendered at the clinic located at 100-05 Roosevelt Avenue, Corona, NY from a "revolving door" of more than 40 different healthcare providers.  The healthcare providers that have billed GEICO from this Clinic include, among others, an array of providers that billed for alleged chiropractic and/or diagnostic testing services, including SpineIsland Chiro, Kazu Chiropractic, P.C., Corona Chiropractic, P.C. Chiropractic Testing Services of New York, P.C., Chiropractic Performance Services, P.C., LLJ Therapeutic Services, P.T. P.C., Corona Chiropractic Health Services, P.C., All Chiropractic, P.C., ABNW Chiropractic, P.C., and Jamaica Avenue Chiropractic, P.C.

63.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 172-17 Jamaica Avenue, Jamaica, New York from a "revolving door" of more than 60 different health care providers. The healthcare providers that have billed GEICO from this Clinic include, among others, an array of providers that billed for alleged chiropractic and/or diagnostic testing services, including SpineIsland Chiro, JLS Chiropractic, P.C. Andes Chiropractic, P.C., BKC Chiropractic, P.C., Optimal Health Chiropractic and Acupuncture, P.C., BMJ Chiropractic, P.C., Chiropractic Testing Services of NY, P.C., Chiropractic Performance Service, P.C., LLJ Therapuetic Services, P.T. P.C., Full Spine Chiropractic of NY, P.C., and Pioneer Chiropractic, P.C.

64.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 183-11 Hillside Avenue, Jamaica, New York from a "revolving door" of more than 20 different health care providers.  The healthcare providers that have billed GEICO from this Clinic include, among others, an array of providers that billed for alleged chiropractic and/or diagnostic testing services, including SpineIsland Chiro, Focus Chiropractic, P.C., Pro Adjust Chiropractic, P.C., First Spine Chiropractic of NY, P.C., Brefni Chiropractic Diagnostics, P.C., Pro Align Chiropractic, P.C., and GC Chiropractic, P.C.

65.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 2367 Westchester Avenue, Bronx, New York from a "revolving door" more than 50 different health care providers.  The healthcare providers that have billed GEICO from this Clinic include, among others, an array of providers that billed for alleged chiropractic and/or diagnostic testing services, including SpineIsland Chiro, New Edge Chiropractic, P.C. Stephen Matrangolo, D.C., Zerega Chiropractic, P.C. Zerega Medical & Diagnostic, P.C., Bronx Neurodiagnostics, P.C., Image Chiropractic, P.C., Westchester Neurodiagnostic, P.C., Capital Chiropractic, P.C., Jamaica Avenue Chiropractic, P.C. and JMSK Medical Diagnostics, P.C.

66.     The operators of the Clinics utilized various unscrupulous tactics in order to generate high volumes of patients that could be subjected to fraudulent No-Fault billing, including illegally paying "runners" to solicit and steer Insureds to the Clinic locations.

67.     SpineIsland Chiro's sole source of patients consists of Insureds that are referred by the Clinics.

68.     Whitney obtains SpineIsland Chiro's sole source of patients by associating himself with the Clinics and paying kickbacks and referral fees to various Clinic personnel (the "Referral Sources").

69.     The payment of kickbacks from Whitney to the Referral Sources allows SpineIsland Chiro to have access to a steady stream of Insureds at the Clinics that could be subjected to the Fraudulent Services billed under the name of SpineIsland Chiro.

70.     Whitney has no genuine doctor-patient relationship with the Insureds at the Clinics.

71.     The Insureds that are subjected to the Fraudulent Services billed under the name of SpineIsland Chiro have no scheduled appointments with SpineIsland Chiro.

72.     The Insureds that are subjected to the Fraudulent Services billed under the name of SpineIsland Chiro are simply directed by the Clinics to subject themselves to treatment by whatever chiropractor, technician, or other healthcare provider happens to be "visiting" or "working" at the Clinic that day.

73.     Whitney knows that his kickback arrangements with the Clinics are illegal and, therefore, he has taken affirmative steps to conceal the existence of the fraudulent referral scheme involving SpineIsland Chiro.

74.     For example, Whitney and the Defendants disguise the payments of the kickbacks as being part of ostensible "lease" agreements with the Clinics or various other healthcare providers.

75.     The alleged "lease" payments to the Clinics and/or other healthcare providers paid by Whitney and/or SpineIsland Chiro are shams, as (i) the payments are not consistent with fair market value; (ii) the terms of the leases are not enforced; and (iii) in some instances Whitney has no written lease at all or no formalized arrangement for the use of a portion of the premises at the Clinics.

76.     Moreover, the alleged "rent" payments by Whitney and/or SpineIsland Chiro are a sham since Whitney makes those payments without actually knowing what legal relationship the recipients of the payments have with respect to the properties that house the Clinics or what authority they have to sublease a portion of the property to him and/or SpineIsland Chiro.

77.     Whitney's ability to pay kickbacks is continually fueled by the thousands of dollars paid by New York automobile insurers to SpineIsland Chiro, which is generated by the excessive and fraudulently inflated billing.

78.     The referrals to SpineIsland Chiro from the Clinics are made without regard for the medical necessity of the chiropractic and testing services purportedly performed by SpineIsland Chiro or the Insureds' individual symptoms or needs.

79.     The Defendants, as well as the owners and controllers of the Clinics, know that the referrals to SpineIsland Chiro are made without regard for the necessity of the chiropractic and testing services or the Insureds' individual symptoms or presentation.

80.     In keeping with the fact that the Fraudulent Services purportedly provided by SpineIsland Chiro are solely for financial gain without concern for genuine patient care, virtually all of the Clinics have a cadre of chiropractors and diagnostic testing providers that perform, or purport to perform, services without regard to any coordination of patient care, without regard to duplication of services, and without regard to the necessity of any of the services.

81.     The Insureds that SpineIsland Chiro allegedly renders services to often have already been subjected to multiple other medical, chiropractic, and neurological evaluations, a myriad of treatments, and a host of other diagnostic tests, including diagnostic nerve testing, which renders the evaluations and diagnostic tests performed by SpineIsland Chiro duplicative, superfluous, and provided solely for financial gain.

82.     No legitimate chiropractor, exercising independent judgement in the best interests of patients, would permit the fraudulent treatment and billing protocol engaged in by SpineIsland Chiro to proceed under his or her auspices alone.

83.     Additionally, no legitimate professional owner of a medical clinic, exercising independent judgement in the best interests of patients, would refer or direct Insureds to SpineIsland Chiro for treatment in their same clinic when the Fraudulent Services that SpineIsland Chiro purports to perform and/or provide play no genuine role in the treatment or care of the Insureds.

C.      **The Defendants' Fraudulent Testing and Billing Protocol**

84.     As part of the Defendants' fraudulent scheme, SpineIsland Chiro purports to subject virtually every Insured to a pre-determined fraudulent treatment protocol, regardless of the nature of the accidents or the actual medical needs of the Insureds, and regardless of the Insureds' individual symptoms or presentment.

85.     Specifically, the Defendants purported to subject virtually every Insured to medically unnecessary ROM/MT, and purported to provide many Insureds with a medically unnecessary "electrodiagnostic evaluation" followed by medically unnecessary electrodiagnostic nerve testing, all billed under the name of SpineIsland Chiro.  This is done regardless of whether the Insured has already received other evaluations, treatments, or diagnostic tests performed prior to the diagnostic nerve testing allegedly performed by SpineIsland Chiro.

86.     The Defendants purport to provide their pre-determined fraudulent testing and treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment.

87.     Each step in the Defendants' pre-determined fraudulent treatment protocol is designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing for each Insured.

88.     The Defendants permit the fraudulent treatment and billing protocol described below to proceed because the Defendants seek to profit from the fraudulent billing submitted to GEICO and other New York automobile insurers.

### i.     The Fraudulent Range of Motion and Muscle Strength Testing

89.     In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, the Defendants purport to subject virtually every Insured to medically unnecessary computerized range of motion and muscle strength testing ("ROM/MT").

90.     The Defendants purport to perform ROM/MT on virtually every Insured, which is then billed to GEICO under the name of SpineIsland Chiro.

91.     Like the Defendants' charges for the other Fraudulent Services, the charges for the ROM/MT are fraudulent in that: (i) the ROM/MT is duplicative and medically unnecessary; and (ii) the ROM/MT are performed – to the extent that they are performed at all – pursuant to the Defendants pre-determined fraudulent billing and treatment protocol and the improper referral and financial arrangements between and among the Defendants.

### a.     Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

92.     The adult human body is made up of 206 bones joined together at various joints that are either of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a joint, rotate a shoulder, or move the neck to one side.

93.     The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount of movement at the joint.

94.     A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the limb actively or passively is moved around the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

95.     Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

96.     Physical evaluations performed on patients with soft-tissue trauma include range of motion and muscle strength tests, inasmuch as these tests provide a reference point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, it will substantially limit the ability to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" evaluation of a trauma patient.

97.     Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial and follow-up examinations.

98.     In other words, healthcare providers cannot conduct and bill for initial examinations and follow-up examinations, then bill separately for contemporaneously-provided range of motion and muscle strength tests.

> b.      **The Defendants' ROM/MT was Duplicative and Medically Unnecessary**

99.     To the extent that the Insureds actually received the initial examinations and follow-up examinations at the Clinics that were billed to GEICO, the Insureds received manual range of motion tests and manual muscle strength tests during those examinations.

100.   The charges for the manual range of motion and manual muscle strength tests were part and parcel of the charges that the Clinics routinely submitted or caused to be submitted for initial examinations and follow-up examinations.

101.   Despite the fact that the Defendants knew that the Insureds already purportedly had undergone manual range of motion and muscle strength testing during their initial examinations and follow-up examinations, the Defendants systemically billed for, and purported to provide, ROM/MT to Insureds in the claims identified in Exhibit "2".

102.   The Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies while the Insured was asked to attempt various motions and movements.  The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

103.   The Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to press three-to-four separate times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and follow-up examinations – except that a digital printout was obtained.

104.   The information gained through the use of the ROM/MT was not significantly different from the information obtained through the manual testing that was part and parcel of the Insureds' initial examinations and follow-up examinations.  In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the

Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless.

105.    While ROM/MT can be a medically useful tool as part of a research project, under the circumstances employed by the Defendants, it represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during the Insureds' initial and follow-up examinations.

106.    The ROM/MT was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

### c.    The Defendants Fraudulently Misrepresented the Existence of Written, Interpretive Reports Regarding the ROM/MT

107.    Not only were the Defendants' charges for the ROM/MT fraudulent because the tests were duplicative and medically unnecessary, the charges were also fraudulent because they falsely represented that the Defendants prepared written reports interpreting the test data.

108.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT code 95851 or for computerized muscle strength testing using CPT code 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

109.    The CPT Assistant states that "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851 and 95852".

110.    The CPT Assistant also states that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95831 to charge for muscle strength testing.

111.    Though the Defendants submitted numerous bills for the computerized range of motion and muscle strength tests using CPT codes 95831and 95851 prior to Whitney entering into the Settlement Agreement – and, in several instances, after Whitney entered into the Settlement Agreement – the Defendants did not prepare written reports interpreting the data obtained from the tests.

112.    Therefore, even if the Defendants had satisfied the other requirements to submit their billing for ROM/MT under CPT codes 95831 and 95851 – and they did not – the Defendants' billing still would not be in compliance with the Fee Schedule due to a failure to submit a separate, distinctly identifiable, and signed written report interpreting the results of the purported ROM/MT for any of the Insureds.

113.    The Defendants did not prepare written reports interpreting the data obtained from the ROM/MT tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the ROM/MT were performed as part of the Defendants' pre-determined fraudulent billing and treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

114.    Additionally, the charges submitted by the Defendants for the ROM/MT under CPT code 97750 were fraudulent because they falsely represented that the Defendants prepared written reports interpreting the test data and documenting the total time spent with the patient.

115.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT code 97750 or for computerized muscle strength testing using CPT code 97750, the provider represents that it has prepared a written report (i) interpreting the data obtained from the test; (ii) documenting the total time spent with the patient; and (iii) documenting the impact of the testing on the patient's plan of care.

116.    The CPT Assistant states that "As code 97750 is a time-based code, the test or measurement procedure as well as the time spent analyzing and interpreting the results in the presence of the patient are elements of the visit that must be documented."

117.    The CPT Assistant also states that "[t]hree time elements must be documented to correctly report code 97750:

- Total time spent with the patient in providing the test and measurement, including the time spent preparing the patient for the test and measurement procedure;
- The time spent performing the selected protocol; and
- The time spent with the patient in providing any post-testing instructions."

118.    The CPT Assistant also states that "[t]he elements of documentation that support the reporting of code 97750, include documentation of the testing elements and/or protocols, documentation and interpretation of the data collected, and impact on the patient's plan of care (ie, discharge, return to sport or activities of daily living (ADL), or modification of treatment)."

119.    Though the Defendants routinely submitted billing for the computerized range of motion and muscle strength tests using CPT code 97750, the Defendants did not prepare written reports interpreting the results of the purported ROM/MT tests, documenting the three required time elements, or documenting how the results would impact the Insureds' plan of care.

120.    Therefore, even if the Defendants had satisfied the other requirements to submit their billing for ROM/MT under CPT code 97750 – and they did not – the Defendants' billing still would not be in compliance with the Fee Schedule due to a failure to submit a separate, distinctly identifiable, and signed written report interpreting the results of the purported ROM/MT, documenting the three required time elements, or documenting how the results would impact the Insureds' plan of care.

121.    The Defendants did not prepare written reports interpreting the data obtained from the tests, documenting the three required time elements, or documenting how the results would

impact the Insureds' plan of care because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the ROM/MT were performed as part of the Defendants' pre-determined fraudulent billing and treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

### ii.      The Fraudulent Electrodiagnostic Evaluations

122.   The Defendants also purported to provide many Insureds with a 30-minute "electrodiagnostic evaluation" (the "Evaluation(s)").

123.   The Defendants performed the Evaluations – to the extent they were performed at all – solely to provide Insureds with predetermined diagnoses to allow the Defendants to then provide and bill for medically unnecessary or illusory electromyography tests ("EMGs") and nerve conduction velocity tests ("NCVs") (together, "EDX tests") through SpineIsland Chiro.

124.   The Defendants customarily billed the Evaluation to GEICO using Current Procedural Terminology ("CPT") code 99203 resulting in a charge of $54.74.

125.   The Defendants' charges for the Evaluations were fraudulent in that: (i) the Evaluations were medically unnecessary and were performed pursuant to the illegal kickbacks SpineIsland Chiro paid to the Clinics; (ii) the CPT code the Defendants billed misrepresented the extent of the Evaluations and the nature of the underlying service; (iii) the Evaluation reports misrepresented the nature, extent and complexity of the Insureds' injuries; and (iv) the Evaluations virtually never took 30 minutes to perform, to the extent that they were performed at all.

126.   In keeping with the fact that the Evaluations were medically unnecessary and performed pursuant to the illegal kickbacks that SpineIsland Chiro paid to the Clinics, and the fraudulent pre-determined treatment protocol, 87% of the Insureds that were referred for an

Evaluation were recommended for the EDX testing. Additionally, all of these Insureds received the EDX testing on the same day as the Evaluations.

127. Additionally, the Defendants' charges for the Evaluations were fraudulent in that the Evaluation reports misrepresented the nature of the underlying service. Pursuant to the Fee Schedule, the use of CPT code 99203 indicates that the chiropractor spent 30 minutes of face-to-face time with the Insured or the Insured's family.

128. Though the Defendants routinely billed for the Evaluations under CPT code 99203, no medical professional associated with the Defendants spent 30 minutes with any Insured during the Evaluations. Instead, for virtually every patient, the Evaluation reports provided by the Defendants are a simple template that sets forth a limited number of patient complaints that contain no evidence that the opinions and services allegedly provided by SpineIsland Chiro were ever incorporated into the Insureds' treatment plans.

129. Additionally, the Evaluation reports do not contain a range of potential treatment recommendations; instead, under the heading "RECOMMENDATIONS," the Defendants indicate that the Insured will have an EMG/NCV to rule out radiculopathy and/or neuropathy.

130. The Defendants' charges for the Evaluations under CPT code 99203 also were fraudulent in that they misrepresented the nature of the underlying service.

131. According to the Fee Schedule, the use of CPT code 99203 requires that a chiropractor associated with SpineIsland Chiro (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in decision-making of "low complexity." The Fee Schedule also states that the use of CPT code 99203 requires that the Insured presents with problems of "moderate severity."

132.    To the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

133.    Even so, the Defendants routinely billed for the Evaluations under CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

134.    The Defendants routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the Evaluations under CPT code 99203, because evaluations billable under CPT code 99203 are reimbursable at a higher rate than evaluations involving presenting problems of low severity.

135.    The Defendants also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the EDX tests that the Defendants purported to provide to the Insureds.

136.    What is more, even though the Insureds almost never presented with problems of moderate severity as the result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate severity, the deficient Evaluations performed were incapable of assessing and/or diagnosing problems of such severity.

137.    In addition, the only face-to-face time between examining physicians and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems. These brief interviews and limited examinations did not entail 30 minutes of face-to-face time with the Insureds or their families, nor did they entail conducting a "detailed" history or physical examination of the Insureds.

138.   In their claims for the Evaluations, the Defendants falsely represented that the Evaluations involved at least 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203, because evaluations billable under CPT code 99203 are reimbursable at a higher rate than evaluations that require less time to perform.

139.   Furthermore, the Defendants routinely falsely represented that their Evaluations involved medical decision-making of "low complexity."   In actuality the Evaluations did not involve any  meaningful medical decision-making, as demonstrated by the fact that at least 87% of the Insureds were recommended for EDX testing after receiving the Evaluation, regardless of their presenting symptoms.

140.   Based on these facts, the outcome of virtually all of the Evaluations was pre-determined. Although the purpose of the Evaluations was to allegedly determine whether the Insureds subjected to them would receive EDX tests, nearly every Insured that underwent an Evaluation with SpineIsland Chiro subsequently received EDX tests through SpineIsland Chiro, regardless of their presenting symptoms.

### iii.        The Fraudulent Electrodiagnostic Testing

141.   Based upon the fraudulent, pre-determined "diagnoses" provided during the fraudulent Evaluations, the Defendants purported to subject many Insureds to a series of medically unnecessary and useless EDX tests.

142.   The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary, often duplicative of other diagnostic nerve testing the Insureds already received, and were performed – to the extent that they were performed at all – pursuant to the fraudulent testing and treatment protocol instituted by the Defendants and the owners and

controllers of the Clinics, and not to benefit the Insureds who purportedly were subjected to them.

143.    The Defendants routinely submitted to GEICO an identical bill in the amount of $2,228.58 for virtually every Insured that received EDX treatment with SpineIsland Chiro.   The fraudulent EDX tests were billed as follows:

    (i)     one unit of CPT code 95864, at a rate of $279.52 per unit, for an EMG of the upper and lower extremities;

    (ii)    eight units of CPT code 95903, at a rate of $113.87 per unit, for NCV studies of eight upper extremity motor nerves with F-wave studies;

    (iii)   twelve units of CPT code 95904, at a rate of $72.83 per unit, for NCV studies of six upper extremity sensory nerves; and

    (iv)    two units of CPT code 95934, at a rate of $82.07 per unit, for two H-reflex studies.

144.    Like the charges for the other Fraudulent Services, the charges for the EDX tests were fraudulent in that the EDX tests (i) were medically unnecessary; and (ii) were performed – to the extent that they were performed at all – pursuant to the fraudulent treatment and billing protocol designed and implemented by the Defendants and the Clinics' owners and controllers to support the fraudulent charges submitted to New York insurers, including GEICO, in order to financially enrich themselves.

145.    Although the Defendants purported to provide EMG/NCV tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, virtually none of the Insureds actually presented with any symptoms or signs of radiculopathy or any other serious medical problems arising from any automobile accidents. In the unlikely event that such symptoms or signs did exist, the deficient EMG and NCV tests – to the extent they were performed at all – were incapable of properly identifying them.

146.     In actuality, the Defendants provided EMG and NCV tests to Insureds as part of the Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit to GEICO for each Insured.

### a.     The Human Nervous System and Electrodiagnostic Testing

147.     The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including, the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

148.     The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

149.     The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

150.     EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

151.   The American Association of Neuromuscular & Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

152.   The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "3".

**b.      The Fraudulent NCVs**

153.   NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin.

154.   An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

155.   In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

156.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers either or both of which can be tested with NCV tests.

157.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

158.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies. See, Exhibit "3".

159.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the Defendants routinely purported to test far more nerves than recommended by the Recommended Policy.

160.    Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform: (i) NCV tests of eight motor nerves; (ii) NCV tests of twelve sensory nerves; and (iii) two H-reflex studies.

161.    Therefore, where the Fee Schedule and Recommended Policy would limit billing by the Defendants for NCV testing of one Insured to $952.33, representing NCVs of three motor nerves with F-wave studies, NCVs of two sensory nerves, and two H-reflex studies, the Defendants routinely submitted NCV billing to GEICO for more than $1,900.00 per Insured.

162.    For instance:

(i)      On or about May 27, 2015, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "TK," which, included (1) one charge for NCVs with F-wave studies of eight motor nerves totaling $910.96; (2) one charge for NCVs of twelve sensory nerves totaling $873.96; and (3) one charge for H-reflex studies of two nerves totaling $164.14.  The NCV billing totaled $1,949.06.

(ii)     On or about December 8, 2015, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "RH," which, included (1) one charge for NCVs with F-wave studies of eight motor nerves totaling $910.96; (2) one charge for NCVs of twelve sensory nerves totaling $873.96; and (3) one charge for H-reflex studies of two nerves totaling $164.14.  The NCV billing totaled $1,949.06.

(iii)    On or about December 22, 2015, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "AA," which, included (1) one charge for NCVs with F-wave studies of eight motor nerves totaling $910.96; (2) one charge for NCVs of twelve sensory nerves totaling $873.96; and (3) one charge for H-reflex studies of two nerves totaling $164.14.  The NCV billing totaled $1,949.06.

(iv)     On or about March 21, 2016, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "JH," which, included (1) one charge for NCVs with F-wave studies of eight motor nerves totaling $910.96; (2) one charge for NCVs of twelve sensory nerves totaling $873.96; and (3) one charge for H-reflex studies of two nerves totaling $164.14.  The NCV billing totaled $1,949.06.

(v)      On or about February 4, 2017, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "JD," which, included (1) one charge for NCVs with F-wave studies of eight motor nerves totaling $910.96; (2) one charge for NCVs of twelve sensory nerves totaling $873.96; and (3) one charge for H-reflex studies of two nerves totaling $164.14.  The NCV billing totaled $1,949.06.

(vi)     On or about September 23, 2017, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "JG," which, included (1) one charge for NCVs with F-wave studies of eight motor nerves totaling $910.96; (2) one charge for NCVs of twelve sensory nerves totaling $873.96; and (3) one charge for H-reflex studies of two nerves totaling $164.14.  The NCV billing totaled $1,949.06.

(vii)    On or about December 2, 2017, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "AR," which, included (1) one charge for NCVs with F-wave studies of eight

motor nerves totaling $910.96; (2) one charge for NCVs of twelve sensory nerves totaling $873.96; and (3) one charge for H-reflex studies of two nerves totaling $164.14.  The NCV billing totaled $1,949.06.

(viii)   On or about February 17, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "IN," which, included (1) one charge for NCVs with F-wave studies of eight motor nerves totaling $910.96; (2) one charge for NCVs of twelve sensory nerves totaling $873.96; and (3) one charge for H-reflex studies of two nerves totaling $164.14.  The NCV billing totaled $1,949.06.

163.   The Defendants fraudulent protocol also involved routinely testing the same peripheral nerves and nerve fibers. The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

164.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

165.   This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

See Exhibit "3".

166.   This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

167.   Even so, the Defendants did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

168.   Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in the vast majority of the claims identified in Exhibit "2".

169.   In particular, the Defendants purported to test some combination of the following peripheral nerves and nerve fibers (and in most cases, all of them) in the vast majority of every EMG and NCV test identified in Exhibit "2":

(i)      left and right median motor nerves;

(ii)     left and right peroneal motor nerves;

(iii)    left and right tibialis motor nerves;

(iv)     left and right ulnar motor nerves;

(v)      left and right median sensory nerves;

(vi)     left and right radial sensory nerves;

(vii)    left and right dorscutan sensory nerves;

(viii)   left and right sural sensory nerves;

(ix)     left and right ulnar sensory nerves; and

(x)      left and right peroneal sensory nerves.

170.   The Defendants' pre-determined, boiler-plate approach to the NCVs that the Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the Defendants purported to perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers in order to maximize the Defendants' ill-gotten profits.

171.   In keeping with the fact that the purported NCVs tests were medically useless, the putative "results" of the NCV tests allegedly administered by the Defendants were never incorporated into any Insured's treatment plan, played no genuine role in the treatment or care of

the Insureds and were only used by the Defendants to justify billing for further unnecessary medical treatment.

### c.    The Fraudulent EMG Tests

172.    The Defendants also purported to provide medically unnecessary EMGs to many Insureds as part of their pre-determined fraudulent treatment and billing protocol.

173.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

174.    There are many different muscles in the arms and legs that can be tested using EMGs.  The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle.

175.    As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

176.    The Defendants did not tailor the EMGs they purported to perform to the unique circumstances of each patient. Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patients' presentation.

177.    According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.

178.    Even so, the Defendants purported to provide and/or perform EMGs on all four limbs on the vast majority of Insureds that purportedly received EMG testing, in excess and in

contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers, and solely to maximize the profits that they could reap from each Insured.

179.    The Defendants purported to perform EMGs to Insureds in order to determine whether the Insureds suffered from radiculopathies. In actuality, the EMGs were provided – to the extent they were provided at all – as part of the Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing they could submit for each Insured.

180.    In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of the Defendants' EMG tests were not incorporated into any Insured's treatment plan, they played no genuine role in the treatment or care of the Insureds and were only used by the Defendants to justify further unnecessary medical treatment.

181.    Furthermore, in keeping with the fact that the Defendants performed these tests pursuant to a fraudulent, pre-determined treatment and billing protocol designed to maximize profit, in several instances Defendants billed for EMG and NCV testing, but did not actually perform the EMG portion of the test.

182.    According to the Recommended Policy, both NCV tests and EMG tests normally are required for a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. See Exhibit "3." As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [Nerve Conduction Studies] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
>
> \*       \*       \*
>
> The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances.

See Exhibit "3."

183.   Therefore, not only did the Defendants bill for services they did not actually provide (i.e. the EMG tests), but the Defendants performed at least two NCV tests that were of no diagnostic value whatsoever because it was not performed in conjunction with an EMG test.

184.   In keeping with the fact that the Defendants performed the Fraudulent Services pursuant to a fraudulent, predetermined treatment and billing protocol designed solely to maximize profit, the Defendants always performed EDX tests immediately following the neurological examination, rather than on a separate day.

185.   To the extent actually done, a neurological examination billed under CPT code 99203 followed by a properly conducted four-limb EMG and NCV test would require the Defendants to spend approximately two hours with each Insured.   The fact that each of the Insureds purportedly subjected to the Fraudulent Services set aside approximately two hours to receive an examination and EDX testing indicates that either: (i) the Insureds knew in advance that they were to receive the Fraudulent Services because the Fraudulent Services are rendered pursuant to a *pre-determined* treatment protocol, or (ii) the Fraudulent Services were not actually rendered as billed.

### D.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

186.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of bills, NF-3 forms , and treatment reports through SpineIsland Chiro to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

187.   The bills, NF-3 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The bills, NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary, and were performed – to the extent they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The bills, NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The bills, NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal and improper referral arrangements.

**E.      The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

188.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

189.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

190.    Specifically, the Defendants knowingly misrepresented and concealed facts related to SpineIsland Chiro in an effort to prevent discovery that SpineIsland Chiro was engaged in kickbacks and illegal payments for referrals.

191.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

192.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

193.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages based upon the fraudulent charges.

194.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Whitney and SpineIsland Chiro**
**(Breach of Contract)**

195.     GEICO incorporates, as though fully set forth at length herein, each and every allegation contained in the paragraphs set forth above.

196.     At all relevant times there was an agreement between GEICO and Whitney pursuant to which Whitney, and any entity owned or controlled by him, agreed not to: (i) bill GEICO for the performance of the services resulting in the Prohibited Billing, and by extension (ii) file lawsuits, arbitrations or other proceedings against GEICO seeking payment for the performance of the services resulting in the Prohibited Billing.

197.     Whitney, as described above, has engaged in conduct in direct violation of the terms of the Settlement Agreement.

198.     As a result of the Defendants' breach of the Settlement Agreement, GEICO has been damaged and is entitled to judgment against the Defendants for such, including but not

41

limited to (i) repayment to GEICO of at least $3,450.00 in payments that GEICO made to SpineIsland Chiro based on the breach of the Settlement Agreement, and (ii) reimbursement to GEICO of the costs, expenses and legal fees incurred by GEICO in defending the Prohibited Collection Actions filed by or on behalf of SpineIsland Chiro, including the non-refundable fees that GEICO was caused to pay to AAA as well as interest; and (iii) the legal fees, costs, and disbursements that GEICO incurs in the prosecution of this action in order to secure compliance with the Settlement Agreement.

**SECOND CAUSE OF ACTION**
**Against All Defendants**
**(Declaratory Judgment Concerning Breach of Contract Under 28 U.S.C. § 2201)**

199.   GEICO incorporates, as though fully set forth at length herein, each and every allegation in the paragraphs set forth above.

200.   There is an actual case in controversy between GEICO and the Defendants as the Defendants have not renounced their entitlement to reimbursement for payment for the Prohibited Billing that has been submitted to GEICO but not paid by GEICO.

201.   In particular, the Defendants have submitted Prohibited Billing to GEICO exceeding $78,000.00, which was submitted in direct violation of the Settlement Agreement and which has never been withdrawn or renounced by the Defendants despite due demand by GEICO.

202.   Accordingly, GEICO requests a judgment pursuant to 28 U.S.C. § 2201 (i) declaring that the Defendants have no right to receive payment for the Prohibited Billing, and (ii) permanently enjoining the Defendants from submitting any bills or prosecuting any future lawsuits and/or arbitrations against GEICO seeking payment for the services resulting in the Prohibited Billing.

### THIRD CAUSE OF ACTION
### Against All Defendants
### (Declaratory Judgment Concerning Fraud – 28 U.S.C. §§ 2201 and 2202)

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

204.    There is an actual case in controversy between GEICO and the Defendants regarding more than $274,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

205.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

206.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided pursuant to a fraudulent scheme involving the illegal referral and kickback arrangements among the Defendants and the Clinics.

207.    Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

208.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants, including SpineIsland Chiro, have no right to receive payment for any pending bills submitted to GEICO.

## FOURTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

209.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

210.    SpineIsland Chiro, Whitney and John Doe Defendants "1" – "5" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

211.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that SpineIsland Chiro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was not properly licensed in that it engaged in an illegal fraudulent scheme involving improper kickbacks and illegal patient referrals; and (ii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, and were performed – to the extent they were performed at all – pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iii) in every claim the representation that the billed for services were properly billed, when, in fact, the level of services were exaggerated and the charges inflated.

212.    Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through SpineIsland Chiro that were not compensable under the No-Fault Laws.

213.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $117.000.00 pursuant to the fraudulent bills submitted by the Defendants through SpineIsland Chiro.

214.    Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

215.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

216.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

217.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

218.    When GEICO paid the bills and charges submitted by or on behalf of SpineIsland Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

219.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

220.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

221.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $117,000.00.

## JURY DEMAND

222.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against SpineIsland Chiro and Whitney, more than $3,450.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

B.     On the Second Cause of Action against SpineIsland Chiro and Whitney, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, (i) that the Defendants have no right to receive payment for the Prohibited Billing, totaling more than $78,000.00 and (ii) permanently enjoining Defendants from submitting any bills or prosecuting any future lawsuits and/or arbitrations against GEICO seeking payment for the Prohibited Billing;

C.     On the Third Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants, including SpineIsland Chiro, have no right to receive payment for any pending bills, submitted to GEICO;

D.     On the Fourth Cause of Action against all Defendants, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $117,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.     On the Fifth Cause of Action against all Defendants, more than $117,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court

deems just and proper.

Dated:  August 30, 2018

RIVKIN RADLER LLP

By: _____

      Barry I. Levy (BL 2190)
      Michael A. Sirignano (MS 5263)
      Garin Scollan (GS 7780)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and GEICO
Casualty Company*

3994260

47